UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL NO.: |
| v. | ) | |
| | ) | Securities Fraud |
| | ) | (15 U.S.C. §§ 78j(b) & 78ff; |
| | ). | 17 C.F.R. § 240.10b-5) |
| HAROLD ALTVATER, | ) | |
| | ) | Criminal Forfeiture Allegation |
| Defendant. | ) | (18 U.S.C. § 981(a)(1)(C) & 28 U.S.C. |
| | ) | § 2461(c)) |
| | ) | |

**INDICTMENT**

The Grand Jury charges that:

**GENERAL ALLEGATIONS**

At times material to this Indictment:

Certain Relevant Persons and Entities

1.     HAROLD ALTVATER ("ALTVATER"), was a physician and resident of

Massachusetts.  Until approximately 2011, ALTVATER worked as an anesthesiologist.  He

thereafter set up a practice devoted to certifying patients for treatment with medical marijuana.

2.     Ariad Pharmaceuticals, Inc. ("Ariad") was a biopharmaceutical company

incorporated in the State of Delaware and with its principal place of business in Cambridge,

Massachusetts, that was focused on the development of drugs for the treatment of various forms

of cancer.  Ariad's shares were securities, as that term is defined in Title 15, United States Code,

Section 78c(a)(10), that were registered with the United States Securities and Exchange

Commission ("SEC") pursuant to Section 12(b) of the Securities Exchange Act of 1934, and

publicly traded on the NASDAQ Stock Market under the ticker symbol ARIA.  The NASDAQ

Stock Market was a national securities exchange.

      3.      From in or about and between September 2006 to March 2014, ALTVATER's

spouse, who has a different surname, was employed in various positions at Ariad, including

ultimately as senior director of pharmacovigilance and risk management.  During that same

period, ALTVATER and his spouse resided together.

Background of the Insider Trading Scheme

      4.      Among the drugs Ariad was developing and testing during the time

ALTVATER's spouse was employed at the company was ponatinib, a drug intended principally

for the treatment of chronic myeloid leukemia and acute lymphoblastic leukemia.  Ponatinib was

marketed under the trade name "Iclusig."

      5.      As Ariad's senior director of pharmacovigilance and risk management,

ALTVATER's spouse was involved in regulatory compliance and systems for safety reporting to

regulators.  As part of her work, ALTVATER's spouse knowingly possessed material non-public

information ("MNPI") concerning Ariad's efforts to commercialize Iclusig and other drugs,

including information regarding Iclusig's performance in various clinical trials and Ariad's

negotiations with the Food and Drug Administration ("FDA") concerning the drug's

commercialization.

      6.      ALTVATER's spouse was subject to Ariad's insider-trading policy, which

provided, among other things, that no employee or member of an employee's immediate family

could buy or sell securities of the company while the employee was in possession of MNPI.

7.      ALTVATER was aware of his spouse's role in drug safety at Ariad and that she was privy to MNPI based on her employment and responsibilities.  He was also aware of Ariad's insider-trading policy.

8.      ALTVATER and his spouse had a history, pattern, and practice of sharing confidences with each other and ALTVATER owed his spouse a duty of trust and confidence.

## The Insider Trading Scheme

9.      On or about various dates between approximately September 2013 and January 2014, pursuant to his relationship of trust and confidence with his spouse, ALTVATER obtained MNPI from her concerning, among other things, Iclusig's performance in various clinical trials and Ariad's negotiations with the FDA concerning the drug's commercialization.

10.     Thereafter, in violation of the duties of trust and confidence ALTVATER owed to his spouse and while in possession of the MNPI, ALTVATER traded in Ariad's shares in his personal brokerage accounts in an effort to earn profits, and avoid losses, based on the subsequent public disclosure of that information.

## The October 2013 Trades

11.     For example, beginning in or about September 2013, FDA officials advised Ariad executives, including ALTVATER's spouse, that they were concerned about the incidence of adverse events in patients being treated with Iclusig in clinical trials.

12.     On or about October 1, 2013, ALTVATER's spouse advised him that she would be flying to Washington, D.C. early the following morning and returning in the evening.

13.     On or about October 2, 2013, ALTVATER's spouse met with FDA officials who expressed concern about the increased incidence of adverse events that had been reported among

3

patients enrolled in clinical trials of Iclusig, which they noted were unprecedented in magnitude for a drug in Iclusig's class.

14.     On or about that same morning—while ALTVATER's spouse was still en route to her meeting at the FDA and prior to the start of trading—ALTVATER emailed a friend a link to an article about a September 30, 2013 report by a securities analyst lowering the analyst's rating and price target on Ariad's stock based on "pulmonary toxicity [that] could be an issue in positioning against multiple emerging competitors." ALTVATER wrote: "Put in stop loss orders for your shares – if any of this stuff is real it will drop 50 – 70% in a matter of hours."

15.     ALTVATER himself, however, did not sell any Ariad shares until the following day, October 3, 2013, after his spouse returned from her meeting at the FDA. Then, while in knowing possession of MNPI concerning his wife's meeting with FDA officials and their concerns, ALTVATER sold nearly 3,000 shares of Ariad from two brokerage accounts in his name, at a price of $18.50 per share. On or about October 4, 2013, ALTVATER sold an additional 3,000 Ariad shares, at a price of $18.70 per share. The shares, which ALTVATER had acquired in or about and between December 2012 and July 2013, represented all of the Ariad shares in ALTVATER's personal brokerage accounts at that time.

16.     On or about the afternoon of October 4, 2013, Ariad's chief financial officer notified the company's employees that "[u]ntil further notice, you may not trade in any securities of ARIAD Pharmaceuticals, Inc." The notification indicated that it applied to, among others, any "immediate family members who reside with you," as well as "others living in your household (whether or not related to you)." The so-called trading "black-out" remained in effect until on or about November 14, 2013.

17. On or about the morning of October 9, 2013, prior to the start of trading, Ariad publicly announced that, in the wake of adverse events experienced by patients in clinical trials of Iclusig, it was pausing enrollment in all clinical trials of the drug, and reducing dosages for patients already enrolled in such trials. That same day, Ariad's stock price declined by approximately 66 percent.

18. By selling his Ariad shares prior to the October 9 announcement, ALTVATER avoided a loss of more than $75,000 on his Ariad investment.

19. On or about October 10, 2013, ALTVATER purchased 9,000 shares of Ariad at a price of $5.45 per share in one of his personal brokerage accounts. The purchase was in violation of the terms of the blackout Ariad had imposed on its employees and their immediate family members.

20. On or about October 15, 2013, ALTVATER purchased an additional 8,000 shares of Ariad at a price of $4.15 in his personal brokerage account. The purchase was a further violation of the terms of the blackout Ariad had imposed.

21. During a teleconference between FDA officials and Ariad executives, including ALTVATER's spouse, on or about October 24, 2013, the FDA's chief of oncology expressed concern about the continued marketing of Iclusig.

22. Shortly after the call concluded, ALTVATER's spouse called ALTVATER, who immediately sold the 17,000 shares of Ariad he had purchased over the prior two weeks, at a price of $3.33 per share. At the time of the sale, ALVATER was in knowing possession of MNPI about the FDA's concerns regarding Iclusig.

23. On or about October 31, 2013, Ariad announced that, in response to a request by the·FDA, it was temporarily suspending the marketing and commercial distribution of Iclusig in

5

the United States. That same day, the company's stock price declined by approximately 44 percent.

24.     By selling his Ariad shares prior to the October 31 announcement, ALTVATER avoided a loss of nearly $20,000 on his Ariad investment.

The December 2013 and January 2014 Trades

25.     On or about November 20, 2013, ALTVATER's spouse participated in a teleconference call with the FDA to discuss a Risk Evaluation and Mitigation Strategy ("REMS") Ariad had submitted to the FDA. A REMS is "a safety strategy to manage a known or potential serious risk associated with a medicine to enable patients to have continued access to such medicines by managing their safe use." During the call, FDA officials advised Ariad that they shared Ariad's desire to return Iclusig to the U.S. market.

26.     On or about November 25, 2013, Ariad's senior director of regulatory affairs advised ALTVATER's spouse and several other Ariad executives that the company had received feedback from FDA on the REMS, and that the company's goal was to submit a revised REMS to the FDA no later than December 5, 2013.

27.     On or about December 4, 2013, Ariad submitted its revised REMS to the FDA.

28.     On or about that same day, ALTVATER purchased 11,500 Ariad shares in his personal brokerage account at a price of $4.85 per share.

29.     ALTVATER subsequently advised his friend that he should increase his investment in Ariad. On or about December 13, ALTVATER's friend purchased 1,200 Ariad shares.

6

30.     On or about December 20, 2013, Ariad announced that the FDA had approved the REMS, and the revised prescribing information Ariad had submitted for Iclusig, allowing "immediate resumption of its marketing and commercial distribution."

31.     On or about January 2, 2014, ALTVATER sent an email to his friend bearing the subject line: "Imagine that? Looks like a rocket today." The email forwarded a press release concerning the FDA's approval of revised standards for Iclusig.

32.     On or about January 6, 2014, ALTVATER sold the 11,500 Ariad shares he had acquired one month earlier, at a price of $6.70 per share, yielding a profit of approximately $21,000.

### The FINRA Letter

33.     In or about later February 2014, the Financial Industry Regulatory Authority ("FINRA") sent Ariad a letter indicating that its Office of Fraud Detection and Market Intelligence was conducting a review of trading in Ariad's stock leading up to the company's October 9, 2013 announcement on Iclusig.  FINRA requested that any employees who may have known details of the news prior to its public announcement indicate, among other things, whether they knew any of the individuals on a list it provided, and if so, how they knew those individuals, the nature and history of the relationship, and "a statement as to the circumstances under which any knowledge of the company's business activities may have been gained by the individual." Together with the letter, FINRA enclosed a seven-page list of names. ALTVATER's name was the fifth name on the list.

34.     Ariad's general counsel forwarded the FINRA letter and the list to ALTVATER's spouse and others on or about March 5, 2014, and requested a response "no later than Wednesday, March 12."

35.     ALTVATER's spouse did not respond to the FINRA inquiry by March 12, 2014, as she had been directed.  Instead, on or about the following day, March 13, 2014, she submitted a letter of resignation to Ariad, effective March 27, 2014.

36.     On or about April 1, 2014, an attorney representing ALTVATER and his spouse submitted a response to FINRA disclosing the couple's marital relationship, and that they had been in daily contact in the period prior to the October 9, 2013 announcement.  The attorney did not provide a response to FINRA's inquiry concerning the circumstances under which ALTVATER may have gained knowledge of the events leading up to Ariad's corporate disclosure.

## COUNT ONE
### (Securities Fraud)

38.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 37 of this Indictment and further charges that:

39.     On or about and between October 3 and October 4, 2013, in the District of Massachusetts and elsewhere, the defendant,

### HAROLD ALTVATER,

did knowingly and willfully, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, directly and indirectly use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities in contravention of Rule 10b-5 (17 C.F.R. § 240.10b-5) of the Rules and Regulations promulgated by the United States Securities and Exchange Commission, and did (a) employ a device, scheme and artifice to defraud, (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading, and (c) engage in acts, practices and a course of business which would and did operate as a fraud and deceit, in connection with the purchase and sale of securities, specifically, by selling shares of Ariad Pharmaceuticals, Inc. while in possession of material, non-public information about that company that ALTVATER misappropriated from his spouse.

All in violation of Title 15, United States Code, Sections 78j(b) & 78ff(a); Title 17, Code of Federal Regulations, Section 240.10b-5.

## COUNT TWO
**(Securities Fraud)**

40.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 37 of this Indictment and further charges that:

41.    On or about October 24, 2013, in the District of Massachusetts and elsewhere, the defendant,

### HAROLD ALTVATER,

did knowingly and willfully, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, directly and indirectly use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities in contravention of Rule 10b-5 (17 C.F.R. § 240.10b-5) of the Rules and Regulations promulgated by the United States Securities and Exchange Commission, and did (a) employ a device, scheme and artifice to defraud, (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading, and (c) engage in acts, practices and a course of business which would and did operate as a fraud and deceit, in connection with the purchase and sale of securities, specifically, by selling shares of Ariad Pharmaceuticals, Inc. while in possession of material, non-public information about that company that ALTVATER misappropriated from his spouse.

All in violation of Title 15, United States Code, Sections 78j(b) & 78ff(a); Title 17, Code of Federal Regulations, Section 240.10b-5.

10

## COUNT THREE
### (Securities Fraud)

42.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 37 of this Indictment and further charges that:

43.     On or about and between December 4, 2013 and January 6, 2014, in the District of Massachusetts and elsewhere, the defendant,

HAROLD ALTVATER,

did knowingly and willfully, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, directly and indirectly use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities in contravention of Rule 10b-5 (17 C.F.R. § 240.10b-5) of the Rules and Regulations promulgated by the United States Securities and Exchange Commission, and did (a) employ a device, scheme and artifice to defraud, (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading, and (c) engage in acts, practices and a course of business which would and did operate as a fraud and deceit, in connection with the purchase and sale of securities, specifically, by purchasing and selling shares of Ariad Pharmaceuticals, Inc. while in possession of material, non-public information about that company that ALTVATER misappropriated from his spouse.

All in violation of Title 15, United States Code, Sections 78j(b) & 78ff(a); Title 17, Code of Federal Regulations, Section 240.10b-5.

## SECURITIES FRAUD FORFEITURE ALLEGATION

The Grand Jury further finds probable cause to believe that:

44.     Upon conviction of one or more of the offenses in violation of Title 15, United States Code, Sections 78j(b) & 78ff(a); and Title 17, Code of Federal Regulations, Section 240.10b-5, set forth in Counts One through Three of this Indictment, the defendant

### HAROLD ALTVATER,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the commission of such offenses.

45.     If any of the property described in Paragraph 44 as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission by the defendant --

    a.   cannot be located upon the exercise of due diligence;

    b.   has been transferred or sold to, or deposited with, a third party;

    c.   has been placed beyond the jurisdiction of this Court;

    d.   has been substantially diminished in value; or

    e.   has been commingled with other property which cannot be divided without difficulty,

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of all other property of the defendant up to the value of the property described in Paragraph 44 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

12

A TRUE BILL

FOREPERSON OF THE GRAND JURY

STEPHEN E. FRANK
Assistant U.S. Attorney

DISTRICT OF MASSACHUSETTS, July 18, 2017
Returned into the District Court by the Grand Jury Foreperson and filed.

DEPUTY CLERK                @ 12:48 PM
                               7/18/17

13