UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL No. 17 CR-10216-DJC |
| HAROLD ALTVATER<br>Defendant | |

The United States recommends that Harold Altvater be sentenced to a term of thirty-six months of incarceration.   Harold Altvater engaged in insider trading by using information entrusted to him by his wife about her company to make money and avoid losses.   He hid his trading from her and lied to her about it.   Altvater's insider trading cheated other investors who did not have access to such inside information.   The securities markets rely upon both the actuality and appearance of fair and transparent markets.   Altvater also obstructed the investigation into his conduct by lying in his testimony before the SEC and to government investigators.   He has consistently demonstrated a lack of acceptance of any responsibility for his own actions or remorse for the harm he has caused, including to his own family members..   Altvater deserves a term of incarceration of three years as punishment for his deliberate wrongdoing.   Such a sentence is also necessary to send an adequate deterrent message to the many people who have access to inside information from their own or their friends and family's work and are tempted to exploit that advantage.

## I.     SUMMARY OF THE RELEVANT FACTS

On October 9, 2018, a jury convicted Altvater on three counts of securities fraud.   The jury thereby found that on October 3-4, October 24 and December to January 2014, Altvater used material non-public information entrusted to him in confidence by his wife to trade in Ariad

stock to make money and avoid losses experienced by other investors.   The evidence at trial also demonstrated the following:

- Altvater deliberately and repeatedly traded in Ariad stock despite the fact that his wife specifically instructed him not to do so.

- Altvater traded in Ariad stock despite the fact that he knew about the applicable insider trading policy at his wife's company and that his conduct violated it.

- Altvater lied to his wife about his trading when she asked him whether he had traded in Ariad stock and hid his trading from her.

- Altvater lied to the SEC in his sworn testimony when he was questioned about the trading.

### Background

Until approximately 2011, Altvater worked as an anesthesiologist.   Although Altvater was capable of continuing to work and earn a substantial income as an anesthesiologist, in about 2011, he mostly stopped working as an anesthesiologist and began largely living off his wife's income.   He then set up a practice for certifying patients for medical marijuana, a business which has steadily lost money.   His wife supported him in that decision, emotionally and financially.   During this time period, Altvater also spent significant time riding his motorcycle (including riding over 140 miles per hour), and gambling.

Ariad was a biopharmaceutical company focused on the developing drugs to treat various forms of cancer.   From about September 2006 to March 2014, Altvater's wife, Maureen Curran was responsible for drug safety issues at Ariad, including ultimately as senior director of pharmacovigilance and risk management.   In this position, she had responsibility for the oversight of safety for Ariad's only marketed drug.   She was one of the key players in the interactions with the FDA about the safety of the drug.

Ariad's only marketed drug at this time was ponatinib or Iclusig, a drug intended principally for the treatment of chronic myeloid leukemia and acute lymphoblastic leukemia. As Ariad's senior director of pharmacovigilance and risk management, Curran was involved in regulatory compliance and systems for safety reporting to regulators.   As part of her work, Curran possessed material non-public information concerning Ariad's efforts to commercialize Iclusig and other drugs, including information regarding Iclusig's performance in various clinical trials, the frequency and nature of adverse events, and Ariad's negotiations with the Food and Drug Administration ("FDA") concerning the drug's commercialization.   Curran was subject to Ariad's insider-trading policy, which provided, among other things, that no employee or member of an employee's immediate family could buy or sell securities of the company while the employee was in possession of material non-public information.

Altvater and his wife shared confidences with each other and Altvater owed his spouse a duty of trust and confidence.   In September and October of 2013, Curran was writing up a description of each of the patient histories in the Ponatnib trial where there had been serious cardiovascular adverse events.   This was in preparation for a cardiac advisory board about these adverse events on October 4, 2013.   Curran, a former nurse, sought the advice of her husband on medical issues relating to the write-ups and he assisted her by actually drafting some of the patient history summaries – which included descriptions of the cardiovascular adverse events. The existence, number and nature of these events was one of the key issues in the interactions with the FDA about the safety and marketability of Ponatnib.

<u>Count I: The October 3-4, 2013 Trades</u>

Beginning in September 2013, FDA officials advised Ariad executives, including Curran,

3

that the FDA was concerned about the incidence of adverse events in patients being treated with Iclusig in clinical trials.   The FDA sought an urgent meeting in early October because of these serious concerns about the safety of Iclusig.

In this same time period, as noted above, Altvater was working with Curran to write summaries of patient histories for paarticipants in Ariad Iclusig clinical trials who had experienced serious adverse events.

On October 1, 2013, Curran told Altvater that she would be flying to Washington, D.C. early the following morning and returning in the evening.

On October 2, 2013, Curran and other Ariad executives met with FDA officials who expressed concern about the increased incidence of adverse events that had been reported among patients enrolled in clinical trials of Iclusig.

On that same morning—while Curran was still en route to her meeting at the FDA and prior to the start of trading—Altvater emailed a friend, Francis MacMillan, and wrote:   "Put in stop loss orders for your shares – if any of this stuff is real it will drop 50 – 70% in a matter of hours."

Altvater himself, however, did not sell any Ariad shares until the following day, after his wife returned from her meeting at the FDA and cried that night at their home about how badly the meeting had gone.   Then, Altvater on October 3-4, 2013, Altvater sold 6,000 shares of Ariad stock from two brokerage accounts in his name.   This was all of the Ariad shares in Altvater's personal brokerage accounts at that time.   Altvater sold these shares despite the fact that his wife had explicitly instructed him not to trade in Ariad stock.   Exh. A (Altvater 7/28/2017 SEC Testimony, at 21-22, 58-59.

On the morning of October 9, 2013, prior to the start of trading, Ariad publicly announced that, in the wake of adverse events experienced by patients in clinical trials of Iclusig, it was pausing enrollment in all clinical trials of the drug, and reducing dosages for patients already enrolled in such trials.   That same day, Ariad's stock price declined by approximately 66 percent.   By selling his Ariad shares prior to the October 9 announcement, Altvater avoided a loss of more than $75,000 on his Ariad investment.

Count II:   The October 24, 2013 Trade

Between October 10 and October 15, 2013, Altvater purchased 17,000 shares of Ariad at in his personal brokerage account.   Altvater admitted in his SEC testimony that he hid these purchases from his wife because he knew she had told him not to trade in Ariad stock.   *Id.* at 88-89, 97-98.

On October 24, 2013, Curran participated in a teleconference with FDA officials in which the FDA's chief of oncology expressed concern about the continued marketing of Iclusig and raised the possibility of taking the drug off the market.   Shortly after the call concluded, Curran called Altvater, who immediately sold the 17,000 shares of Ariad he had purchased over the prior two weeks, for $3.33 per share.   Altvater admitted in testimony before the SEC that he again hid this transaction from Curran because he knew she had instructed him not to trade.

On October 31, 2013, Ariad announced that, in response to a request by the FDA, it was temporarily suspending the marketing and commercial distribution of Iclusig in the United States.   That same day, the company's stock price declined by approximately 44 percent.   By selling his Ariad shares prior to the October 31 announcement, Altvater avoided a loss of nearly $20,000 on his Ariad investment.

Count III:   The December 2013 and January 2014 Trades

On November 25, 2013, Ariad's senior director of regulatory affairs advised Curran and several other Ariad executives that the company had received feedback from FDA, and that the company's goal was to submit documents to the FDA to try to get Iclusig back on the market no later than December 5, 2013.   On December 4, 2013, Ariad submitted these documents to the FDA.

On that same day, Altvater purchased 11,500 Ariad shares in his personal brokerage account.   Altvater subsequently advised his friend, MacMillan that MacMillan should increase his investment in Ariad.   On December 13, 2013, MacMillan purchased 1,200 Ariad shares. Altvater knew, before he made his trade or the tip to MacMillan, that Curran was working on submissions to the FDA to get Iclusig back on the market.   *Id.* at 103-106.

On December 20, 2013, Ariad announced that the FDA had approved the immediate return of Iclusig to the market.

On January 2, 2014, Altvater sent an email to his friend bearing the subject line: "Imagine that? Looks like a rocket today." The email forwarded a press release concerning the FDA's approval of revised standards for Iclusig.

On January 6, 2014, Altvater sold the 11,500 Ariad shares he had acquired one month earlier, at a price of $6.70 per share, yielding a profit of approximately $21,000.

Altvater's False Testimony Before the Securities and Exchange Commission

The jury's verdict also demonstrates that Altvater's gave false testimony before the SEC. On July 28, 2016, in response to a subpoena from the Securities and Exchange Commission (SEC), Altvater testified before the SEC.   In that testimony, Altvater did admit that his wife had

told him not to trade in Ariad stock before the time period of the charged trades and that he had

ignored her and lied to her about whether he was trading in Ariad stock.   However, Altvater also

testified falsely that he had not relied upon inside information from Curran in his trading and

gave false explanations as to why he traded at the times he traded.   To convict Altvater, the jury

had to find that Altvater traded based upon inside information.   Thus, Altvater's statements that

he traded for reasons other than inside information are necessarily contrary to the jury's verdict

and false.   Set forth below are some examples of his false testimony.

- Asked whether he incorporated anything he learned from Curran into his trading, Altvater testified:   "Not specifically.   It's hard, you know, when you talk to someone, what caused me to trade, there wasn't a specific thing.   It would never have been a large factor, and there was never a specific instance."   *Id.* at 34-35.

- Asked about the October 3 and 4 sales of Ariad stock, and why he made them, Altvater testified "there were questions in discussion board . . . there were reports . . . that the cardiovascular events were a big deal, and there was a report that there was a study being done at M.D. Anderson. . . . The bottom line was I decided to get out of it at this price. . . . There seemed to be enough reasons that all the information that there was not going to be a long appreciation of this drug because there is enough evidence that it is not going to be a front-line therapy." *Id.* at 74-81 (explaining purported public reasons for October 3 and 4 sales of Ariad stock)

- Altvater testified that he did not remember the phone call on October 24 or its substance, and he didn't remember it being tied to any specific trade. *Id.*

- Altvater testified that his purchase of shares in December 2013 was not based upon information about Curran's submissions to the FDA, but upon public information.   *Id*. at 107-111.

Overall, Altvater claimed that his purchases and sales of Ariad stock in 2013 were not

based upon use of insider information he misappropriated from Curran.   The jury, however,

concluded otherwise in order to convict him on each of the three counts of securities fraud based

upon a theory of insider trading by misappropriating information entrusted to Altvater in

confidence by his wife.

## II. THE GOVERNMENT'S POSITION ON GUIDELINES

The United States submits that the guidelines in this case are calculated as follows:

| | | |
|---|---|---|
| Base Offense Level | 8 | (§ 2B1.4(a)) |
| Gain/Loss (Greater than $95K but not more than $150K): | +8 | (§ 2B1.1(b)(1)(E)) |
| Abuse of Trust: | +2 | (§ 2B1.3) |
| Obstructing the Administration of Justice | +2 | (3C1.1) |
| **Total Offense Level:** | **20** | **(33-41 months)** |

A.    <u>Calculation of Loss</u>:   Altvater's total gain and loss avoidance from the three counts is $115,657.   As explained at trial by Alexander Scoufis of the Financial Institution Regulatory Authority, the loss avoidance from Altvater's trades in Counts I and II is calculated based upon the difference between the trades Altvater actually made and the amount he would have lost if he had sold after the relevant material negative information became public.   The gain in Count III is the amount Altvater profited from sale of the shares he purchased in December 13, 2013 and sold in January 2014, after the positive information became public. 1 The calculations are set forth in the chart below.

---

1  Altvater made about $5,000 from his 2012 trades based upon inside information and MacMillan made about $5,000 from his trades based upon Altvater's tip.   None of this conduct, however, changes the guideline range and the government has not included these amount in its calculations.

Case 1:17-cr-10216-DJC   Document 95   Filed 01/09/19   Page 9 of 14


| Count I | Proceeds from Altvater's 10/3-4/13 sales: $109,537 | Value of 5,890 shares if sold on 10/9/13: $34,339 | Difference: **$75,198** |
|---|---|---|---|
| Count II | Proceeds from Altvater's 10/24/13 sale: $56,601 | Value of 17,000 shares if sold on 10/31/13: $37,400 | Difference: **$19,201** |
| Count III | Cost of Altvater's 12/4/13 purchase: $55,783 | Proceeds from Altvater's 1/6/14 sale: $77,041 | Difference: **$21,258** |
| **Total Benefit** | | | **$115,657** |

B.     <u>Abuse of Position of Trust</u>:   The crime here involved misappropriating information from Altvater's wife in violation of his duty and trust and confidence to his wife. Thus, it necessarily involved an abuse of a position of private trust under USSG § 3B1.3. Curran testified that she shared information with her husband about her work in confidence and expected him not to use it for any other reason and instructed him not to trade in Ariad stock. She further testified that she provided him specific patient case information because she was consulting him for his expertise as a physician as well as trusting him as her husband not to use the information for any purpose other than to assist her.   Altvater also testified before the SEC that she consulted with him about Ariad case histories for his expertise as a physician.   Exh. A at 17-19.   Moreover, there was evidence from both Curran at trial and Altvater's testimony at the SEC that he handled the couples' finances and she relied upon him to do so, including providing him the password to her own account and having him do the trading in that account Exh. A at 42-46.

The Court's instructions to the jury made clear that the jury had to find an abuse of a

position of trust in order to find Altvater guilty on the charged theory of securities fraud in this

case.   The Court instructed, among other things, as follows:

> In this case, it's alleged that Dr. Altvater's wife, Ms. Curran, was an executive at Ariad who, through her work there, came into possession of material, nonpublic information about the company. The government further alleges that Ms. Curran shared inside information about Ariad with Dr. Altvater with the expectation that the defendant would keep the information to himself but Dr. Altvater instead used that information himself to trade in Ariad stock and profit or avoid losses.

> The defendant, Dr. Altvater, was not himself an insider at Ariad, but he can nonetheless be responsible for insider trading. Insider trading can happen when someone outside of the company misappropriates a material, nonpublic information from a company insider **in violation of a duty of trust and confidentiality that the outsider owed the insider.** The outsider's undisposed self-serving use of the information with **which he was entrusted** either to buy or sell securities himself or to tip others to do so breaches **the duty of trust and confidence that he owed the insider.** This is the essence of insider trading under a misappropriation theory. The outsider secretly misappropriates what he's learned from the insider, that is, uses for his own ends the information **with which he's entrusted.**

Exhibit B, Instruction of United States District Judge Denise Casper, 10/5/2019 (draft transcript,

emphasis added.)

In determining whether there was an abuse of a position of trust pursuant to § USSG

3B1.3, the Court must determine "whether the defendant occupied a position of trust at all; and,

if so, (2) whether the defendant used that position of trust to facilitate or conceal the offense."

*United States v. Nygren*, No. 1:16-CR-00106-JAW, 2018 WL 1733980, at *9 (D. Me. Apr. 10,

2018) (*quoting United States v. Reccko*, 151 F.3d 29, 31 (1st Cir. 1998)).   Here, it is clear that

Altvater occupied a position of trust and used position of trust by using inside information

entrusted to him by his wife because the Court's instructions required to jury to so find in order

to convict.

Moreover, "[i]n evaluating the first step of the § 3B1.1 enhancement analysis, 'the

relevant inquiry ... is whether a person *in fact* occupied a position of trust, rather than whether the person's title or official job description contained a discretionary element.'" *United States v. Sicher*, 576 F.3d 64, 72 (1st Cir. 2009) (quoting *Chanthaseng*, 274 F.3d 586, 589 (1st Cir. 2001)).   The plain language of the guidelines as well case law in this circuit and others supports the application of the enhancement even when the position of trust is "private" and personal instead of just professional.   *See, e.g., United States v. Ellis*, 935 F.2d 385, 395 n.9 (1st Cir. 1991) (enhancement applies when defendant sexually abused young daughter of his common law wife); *United States v. Ledesma*, 979 F.2d 816, 822 (11th Cir.1992) (affirming enhancement for defendant who had her young adult daughter bag cocaine and relay drug-related telephone messages because defendant, as mother, held a position of trust which she abused when she involved her daughter in the drug conspiracy); *United States v. Zamarripa*, 905 F.2d 337 (10th Cir.1990) (imposing enhancement on defendant, a friend of the family of an eight-year-old girl whom he sexually abused because position as babysitter was one of trust).

Although these cases predated the 1993 amendment to § 3B1.3's commentary, those amendments added the proviso to the Advisory Notes that 'Public or private trust' refers to a position . . . characterized by professional or managerial discretion . . . ." 1993 Amendments to U.S.S.G. § 3B1.3 cmt. n1.   Here, Curran entrusted information to Altvater based in part upon his expertise as a physician relied upon Altvater's professional discretion in consulting him as a physician and he exercised managerial discretion over the finances of the couple and the accounts.   For all of these reasons, the abuse of trust enhancement applies to this case and appropriately captures on of the aggravating factors of the fact of this case – Altvater's betrayal

of his wife's trust.

        C.    <u>Obstruction</u>:   Also, because Altvater testified falsely before the SEC that he had not used insider information in making his trading – a claim that the jury necessarily rejected through its guilty verdict, Altvater also committed perjury in his SEC testimony pertaining to the conduct that forms the basis for the offense of conviction and is subject to the two point obstruction enhancement pursuant to USSG 3C1.1 and Application Note 4(B). Altvater knew about the criminal investigation at the time he testified before the SEC.   He made a choice to testify falsely and try to fool investigators into believing that he had traded for some reason other than his access to inside information.   Thus, far from accepting any responsibility for his actions, Altvater compounded his securities violations with his obstruction of the investigation.

        D.  <u>Appropriateness of the Recommended Sentence</u>

        The United States submits a sentence in the middle of that range of 36 months is appropriate and necessary in this case to punish Altvater's serious, blatant and unrepentant criminal conduct.   Atlvater had every opportunity and advantage.   He had no need for the money or reason to cheat.

        The securities markets underpin the lifesavings, retirement savings and pensions of many individual shareholders.   Altvater's conduct cheated many unidentified shareholders. Moreover, this type of conduct undermines confidence in the public securities markets – interfering with the ability of companies – including those trying to bring new and lifesaving drugs to market, to raise capital.   As this case demonstrates, it is all too easy to do.   For those who work or have family in the biotech industry, for example, they are constantly learning new and important development about the drugs in process.   The financial incentives to engage in

such insider trading are enormous.   Only the risk of significant jail time is likely to deter such

relatively easy and tempting crimes to those who live and work in an industry with constant

access to the valuable information of others.

Through his criminal conduct, Altvater also victimized his wife.   He got her to share

information with him about her company in the guise of assisting her, or listening to her as a

husband, and then secretly was using that information to trade in Ariad stock, while hiding his

trading from her and lying about it.   He knew he was imperiling the job she loved.   He knew he

was risking her career and pursuit of a cure for the disease suffered by her father.   He knew he

was risking the salary that supported them and their daughter.   And when it was discovered, he

continued to lie to her, not tell her the whole truth, and not take any responsibility for his actions.

She supported him emotionally and financially and he just took advantage of her over and over

again.   As he himself testified, he even said to Curran "you will suffer, you will never leave

me."   Exh. A at 85.

A serious term of incarceration is appropriate here, however, not only to justly punish

Altvater for his conduct and in light of his utter lack of acceptance of responsibility, but also in

order to fairly administer justice as to those who commit crimes for money.   A fair justice

system requires that such financial crimes bear serious terms of incarceration, just as many non-

white collar crimes do.   It also requires that a person such as Altvater, who had the privileges

of education, wealth and opportunities for meaningful employment, but commits serious crimes

not be permitted to avoid significant prison terms when others less fortunate are not.   A jail

term of thirty-six moths is appropriate and not more than necessary here to appropriately punish

this defendant and send a clear deterrent messages to those who are tempted to take advantage

of their access to corporate information to cheat the public markets and the vast majority of ordinary investors.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:     /s/ Sara Miron Bloom
SARA MIRON BLOOM
Assistant United States Attorney
(617) 748-3265
MICHAEL VITO
Special Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) .

_____/s/ Sara Miron Bloom_____
SARA MIRON BLOOM
Assistant United States Attorney

Date: January 9, 2019